[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 11-15101
_____

D.C. Docket No. 9:09-cv-81008-KLR


SOVEREIGN MILITARY HOSPITALLER ORDER OF
SAINT JOHN OF JERUSALEM OF RHODES AND OF MALTA,

Plaintiff - Counter
Defendant - Appellant,

versus

THE FLORIDA PRIORY OF THE KNIGHTS HOSPITALLERS OF THE
SOVEREIGN ORDER OF SAINT JOHN OF JERUSALEM, KNIGHTS
OF MALTA, THE ECUMENICAL ORDER,

Defendant - Counter
Claimant - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(September 11, 2012)

Before WILSON, PRYOR, and MARTIN, Circuit Judges.

WILSON, Circuit Judge:

Plaintiff-Appellant Sovereign Military Hospitaller Order of Saint John of Jerusalem of Rhodes and of Malta (Plaintiff Order) is a religious order of the Roman Catholic Church that undertakes charitable work internationally. Defendant-Appellee The Florida Priory of the Knights Hospitallers of the Sovereign Order of Saint John of Jerusalem, Knights of Malta, The Ecumenical Order (The Florida Priory) is also a charitable organization, having an expressly ecumenical, rather than Catholic, association. Although The Florida Priory incorporated in Florida in 2005, it is associated with a parent organization, Knights Hospitallers of the Sovereign Order of Saint John of Jerusalem, Knights of Malta, the Ecumenical Order (The Ecumenical Order), which was first incorporated in the United States in 1911. The Ecumenical Order is not associated with the Catholic Church, although approximately sixty percent of its members are Catholic.

Plaintiff Order filed suit against The Florida Priory in July of 2009 asserting infringement and false advertising claims under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, as well as state law claims for unfair competition and violation of the Florida Deceptive and Unfair Trade Practices Act (FDUTPA), Fla. Stat. § 501.201 *et seq.* The infringement claims were based on The Florida Priory's alleged use of marks that are confusingly similar to those for which Plaintiff Order has obtained

2

federal registrations.  In the false advertising claim, Plaintiff Order charged that The Florida Priory (through its parent) falsely claimed a historic affiliation with Plaintiff Order going back to the eleventh century.  The state law claims derive from these same allegations.  The Florida Priory counterclaimed, alleging that Plaintiff Order committed fraud on the United States Patent and Trademark Office (PTO) in applying for its service marks due to Plaintiff Order's failure to disclose its knowledge of the domestic presence of other organizations that used similar marks in commerce.

The district court ruled in favor of The Florida Priory on all counts of Plaintiff Order's complaint and The Florida Priory's counterclaim.  This appeal followed, and after thorough consideration, we affirm in part, reverse in part, and vacate in part the judgment below and remand for further proceedings.

## I.    Facts and Procedural History

Starting on February 28, 2011, the district court held a three-day bench trial on the claims and counterclaims asserted by the parties.  The vast majority of testimony related to the histories of the organizations involved, including The Ecumenical Order.  Because of the fact-intensive nature of this case, we summarize the trial proceedings and the resulting findings of fact and conclusions of law by the district court, which were reported in a published opinion.  *See*

3

*Sovereign Military Hospitaller Order of Saint John of Jerusalem of Rhodes and of Malta v. The Fla. Priory of Knights Hospitallers of the Sovereign Order of St. John of Jerusalem, Knights of Malta, The Ecumenical Order*, 816 F. Supp. 2d 1290 (S.D. Fla. 2011).

### A.    Plaintiff Order's History and Service Mark Registrations

#### 1.    Trial Testimony Regarding History

As part of its case, Plaintiff Order presented the testimony of Geoffrey Gamble, a representative of Plaintiff Order, and Dr. Theresa Vann, an expert historian, to trace the history of Plaintiff Order from its founding to present. According to these witnesses, Plaintiff Order was founded in Jerusalem in the eleventh century. (D.E. 144, 37:11–12.)  It relocated to the City of Acre and later to the island of Rhodes, where it was known as the Knights of Rhodes.  (*Id.* at 37:12–16.)  After spending about two-hundred years on the island of Rhodes, the group located in Malta (becoming the Order of Malta), which had been ceded for the Order's use by Emperor Charles V.  (*Id.* at 37:16–18.)  Organizationally, multiple priories—a term which Gamble explained references canonical religious bodies where people are housed, (*id.* at 48:25–49:1)—existed across Europe.[1]  At some point there existed priories in Poland, Bavaria, and England, though the

---

[1] Depending on the size, these bodies could be classified as sub-priories, priories, or a grand priory.  (D.E. 114, 49:6–10.)

Polish priory had been lost when Poland was partitioned.  (D.E. 145,110:12–18.)

Around 1797 or 1798, the Order of Malta was suffering financial hardship and sought monetary support from Czar Paul I of Russia.  (*Id.* at 108:20–109:3.) Two knights went to Russia seeking to obtain the property of the former Polish priory, and out of this visit came an agreement to create a Catholic-affiliated Russian priory.  (*Id.* at 110:25–111:9.)

In 1798, Napoleon expelled the Order of Malta and its knights from the island of Malta, and the organization relocated to present-day Italy.  (D.E. 144, 37:17–19; D.E. 145, 111:13–25.)[2]  The Order of Malta's Grand Master at the time, Ferdinand von Hompesch zu Bolheim, wrote to Czar Paul I for support after this expulsion.  (D.E. 145, 111:12–18.)  Czar Paul I, in response to the request for assistance and "for reasons best known to himself," created a non-Catholic order for the non-Catholic members of his court.  (*Id.* at 112:6–10.)  Czar Paul I then had the two priories—the Catholic Russian priory and the non-Catholic priory— declare von Hompesch deposed, and Czar Paul I established himself as Grand Master.[3]  (*Id.* at 112:10–12.)  Czar Paul I was assassinated in 1801, and his son

_____

[2] Dr. Vann testified that many of the Knights of Malta returned to their homeland, but she was unsure of how many (if any) specifically fled to Russia.  (D.E. 145, 112:1–4.)

[3] Gamble and Dr. Vann clarified that this was a *de facto* title, since Czar Paul I did not meet any of the requirements to be Grand Master.  (D.E. 145, 112:20–113:7.)

5

Alexander became Czar of Russia. (*Id.* at 114:16–17.)

In the early 1800s, the two Russian priories, along with the other European priories, elected Giovanni Battista Tomassi as Grand Master. (*Id.* at 118:16–19.) Czar Alexander I did not entertain the activities of either of the two Russian priories and in 1810 abolished them by taking away their lands. (*Id.* at 115:6–8, 116:15–22.)

Grand Master Tomassi served for only a couple of years, and the next Grand Master was not confirmed by the Pope until 1879. (*Id.* at 123:3–7.) The title of Grand Master was in abeyance for that period because of the warfare in Europe and, importantly, because Plaintiff Order was without land, a headquarters, or revenue. (*Id.* at 121:16–122:16.) The Order utilized that interim period to redefine its responsibilities and focus on its hospitaller, rather than its military, activities. (*Id.* at 119:24–120:5, 122:18–23.) Likewise, over the past century, Plaintiff Order has served to provide hospital accommodations and serve as a religious order of the Catholic Church. (*Id.* at 124:3–6.) It is currently headquartered in Rome. (*Id.*)

Plaintiff Order began operating in the United States in 1926 or 1927 when it established the American Association in New York. (D.E. 144, 90:11–12.) Later, Plaintiff Order established the Western Association, based in San Francisco, and the Federal Association, based in Washington, D.C. (*Id.* at 106:7–9, 107:8–10.)

6

There are about 3000 Knights and Dames of Plaintiff Order within the United States.  (*Id.* at 190:23.)

### 2.    Service Mark Registrations

Plaintiff Order has obtained the following registrations for its service marks:

| Registration No. | Mark | First Use in Commerce Date | Registration Date |
|---|---|---|---|
| 2,799,898 | | 12/31/1926 | 12/30/2003 |
| 2,783,933 | SOVEREIGN MILITARY HOSPITALLER ORDER OF ST. JOHN OF JERUSALEM OF RHODES AND OF MALTA | 12/31/1926 | 11/18/2003 |
| 2,783,934 | KNIGHTS OF MALTA | 12/31/1926 | 11/18/2003 |
| 2,915,824 | HOSPITALLERS OF ST. JOHN OF JERUSALEM | 4/28/1927 | 1/4/2005 |
| 3,056,803 | ORDER OF ST. JOHN OF JERUSALEM | 4/28/1927 | 2/7/2006 |

The applications for these service marks were executed by Dean Francis Pace, a member of Plaintiff Order.  He attested on each application that he was authorized

7

to execute the application, that he believed Plaintiff Order to be the owner of the specific mark, that he believed Plaintiff Order was entitled to use the mark in commerce, and that to the best of his knowledge no other entity had the right to use a similar mark.  (D.E. 127-2, 69, 86–87.)  After some back and forth with the PTO,[4] Plaintiff Order's marks were registered.

### B. The Florida Priory's History and Relevant Service Mark Registrations

#### 1. Trial Testimony Regarding History

The testimony about the origins of The Florida Priory came largely from Nicholas Papanicolaou, the current Prince Grand Master of The Ecumenical Order (parent organization of The Florida Priory).  His testimony of history up until Napoleon's invasion of Malta is in accord with the version of events presented by Plaintiff Order's witnesses.  The accounts of history differ beginning around 1798.  According to Papanicolaou, after Napoleon invaded and expelled the knights from Malta, the knights relocated all across Europe.  (D.E. 146, 21:14–20.)  Approximately three-hundred knights ended up in Russia, and consistent with the procedures of the Order of Malta, their sixteen-person electoral college elected

---

[4] The examining attorney of the PTO found a collective membership mark previously registered by an affiliate of The Ecumenical Order.  (D.E. 127-2, 76–77.)  Plaintiff Order was able to distinguish that mark and successfully register its service marks.

Czar Paul I[5] as the new Grand Master. (*Id.* at 21:18–222:5.) Czar Paul I instituted three fundamental organizational changes: (1) the Grand Master was not required to be a cleric, (2) titles could be passed hereditarily, and (3) the order was open to non-Catholics. (*Id.* at 29:2–23.)

Panpanicolaou testified that around this time the Order of Malta ceased to exist as it had prior to 1798. (*Id.* at 24:3–4.) The Order of Malta no longer had territory, and the relocation of many of its knights into Russia meant that the Russian Order, which had elected Czar Paul I as Grand Master, was the legitimate continuation of that group. (*Id.* at 25:3–10.) After the assassination of Czar Paul I, his son Alexander became protector of this Russian order. (*Id.* at 22:6–17.) At that time, the Russian order was composed of two priories: the Catholic-affiliated Polish Grand Priory and the non-Catholic Russian Grand Priory. (*Id.* at 22:11–17.) In order to secure alliances that were required to take on Napoleon, Alexander returned the Polish Grand Priory to the Pope. (*Id.* at 23:9–13.)

The return of the Catholic priory marked the origin of the organization that is now Plaintiff Order. (*Id.* at 25:3–10.) The non-Catholic Russian Grand Priory persisted in Russia until the Bolshevik revolution, at which time the headquarters was moved to the United States. (*Id.* at 25:11–16.) This organization eventually

---

[5] Although Papanicolaou refers to Russia's leader as Emperor Paul I, we use the title Czar for the sake of consistency with Dr. Vann's testimony.

9

became known as The Ecumenical Order, and it had its first meeting in the United States on January 10, 1908, as memorialized in its minutes. (*Id.* at 25:23–26:6.)

In January of 1911, The Ecumenical Order incorporated in New Jersey under the name "The Knights of Malta, Inc." (the New Jersey Corporation).[6] (D.E. 25-1, Exh. 2; D.E. 146, 40:2–9.) A companion and successor organization to the New Jersey Corporation was formed in Delaware in August of 1956 under the name "Sovereign Order of Saint John of Jerusalem, Inc." (the Delaware Corporation). (D.E. 25-1, Exh. 3; D.E. 146, 37:7–10; 75:17–25.) The late 1970s brought turmoil to the group, and in 1981, The Ecumenical Order severed ties with the leadership of the Delaware Corporation. (D.E. 146, 47:16–51:25.) The Ecumenical Order raises funds and undertakes charitable activities notwithstanding its present unincorporated status. Approximately sixty percent of The Ecumenical Order's members are Catholic. (D.E. 145, 24:22–23.)

The Florida Priory began operating as early as 1977. (D.E. 146, 7:1, 47:22–48:3.) The Florida Priory has used the marks of its parent, The Ecumenical Order, since its founding. In 2005, The Florida Priory incorporated in Florida, (*id.* at 7:9), and its principal place of business is located in West Palm Beach.

### 2.    Service Mark Registrations

---

[6] This corporation was administratively dissolved in 1989.

In 1958, The Ecumenical Order (acting through the Delaware Corporation) obtained Registration No. 659,477, "SOVEREIGN ORDER OF SAINT JOHN OF JERUSALEM KNIGHTS OF MALTA," as a collective membership mark, which indicates membership in an organization. This registration reflects that the collective membership mark was first used in commerce in January 1911. This registration remains active today.[7]

### C.    Purported Communications Between The Ecumenical Order and Plaintiff Order

The Florida Priory submitted three specific instances of communication among members of Plaintiff Order and The Ecumenical Order.[8] First, in November 1983, Grand Chancellor Thorbjorn Wiklund of The Ecumenical Order sent a letter on the organization's letterhead to Plaintiff Order's Rome headquarters. (D.E. 25-3, Exh. 7.) Through this letter, Wiklund alerted Plaintiff Order to a trademark dispute involving a corporation that registered a similar name

---

[7] Although two of Plaintiff Order's American groups petitioned to cancel this collective membership mark in the 1980s, that petition was dismissed with prejudice upon its withdrawal by the petitioning parties. (D.E. 25-3, Exh. 8.)

[8] These three correspondences are in the record in support of The Florida Priory's motion for summary judgment on Plaintiff Order's claims. The district court relied on them largely to support The Florida Priory's claim of fraud on the PTO. Some of these documents—particularly the letter from Guy Stair Sainty—are simply printouts from the Internet and, therefore, of questionable veracity. Nevertheless, we include them in the recitation of facts because, even if we consider them to be accurate depictions of the truth, they are insufficient to sustain a claim of fraud on the PTO, as discussed later.

11

in October 1979.  (*Id.*)  The letter requested assistance from Plaintiff Order in helping to stop the activities of the newly registered organization.  (*Id.*)

Second, in April 2000, Guy Stair Sainty, a current member of Plaintiff Order, appears to have sent a letter to a member of The Ecumenical Order named Rick Joyner.  (D.E. 26-1, 6–8.)  Stair Sainty is presently a member of Plaintiff Order and serves on its committee on false orders.  He is also the author of "The Self-Styled Orders of Saint John," a publication in which he mentions the existence of The Ecumenical Order.  (*Id.*)  Joyner, an author himself, has previously written *Courage that Changed the World: The Extraordinary History of the Knights of St. John*, which promotes The Ecumenical Order and its history.  (*Id.* at 1–6.)  Stair Sainty's letter, sent after he came across Joyner's book, informed Joyner that The Ecumenical Order is a modern-day invention with no connection to the eleventh century order (of which the only legitimate successor is Plaintiff Order).  (*Id.* at 7.)  Stair Sainty also included with the letter a copy of his publication in hopes of correcting Joyner's perception of history.  (*Id.*)  At the time the letter was sent in 2000, Stair Sainty was not a member of Plaintiff Order.  (D.E. 144, 208:8–14; D.E. 146, 152:12–15.)

In July 2000, Chancellor Prince Boudewijn de Merode, a member of Plaintiff Order, wrote a letter to Joseph Frendo Cumbo, former Prince Grand

12

Master of The Ecumenical Order.  (D.E. 25-7, Exh. 13.)  Cumbo was

Papanicolaou's predecessor and, in the letter, it was apparently acknowledged that

The Ecumenical Order could dub knights.  (*Id.*)[9]

### D.    The District Court's Ruling

#### 1.    Findings of Fact

The district court's findings of fact recounted the histories of Plaintiff Order,

The Ecumenical Order, and The Florida Priory.  Most significant for this appeal,

the district court found that up until 1798, Plaintiff Order and The Ecumenical

Order shared a history through a common predecessor.  *Sovereign Military*

*Hospitaller*, 816 F. Supp. 2d at 1293–94 & n.1.  Upon Napoleon's invasion of

Malta, the knights scattered, and some of them ended up in Russia.  *Id.* at 1293.

There, both a Catholic order and a non-Catholic order were established, and this is

where the groups diverge.  *Id.* at 1294.  The Catholic Order in Russia is the

predecessor to Plaintiff Order, and the non-Catholic order is the predecessor to The

Ecumenical Order (and, in turn, The Florida Priory).  *Id.*

#### 2.    Conclusions of Law

The district court first examined The Florida Priory's claim of fraud on the

---

[9] The original letter is written in Dutch, and following its entry in the record is an unverified translation of its contents.  Again, we assume this is an accurate translation because, accepting it as true, it still does not help to establish The Florida Priory's claim of fraud.

13

PTO.  The district court canceled four of Plaintiff Order's service mark registrations[10] based on its finding that Plaintiff Order committed fraud in executing the oath that accompanies the federal registration applications. *Sovereign Military Hospitaller*, 816 F. Supp. 2d at 1299–1300.  Specifically, the district court found that Plaintiff Order was aware of the domestic presence of The Ecumenical Order since as early as 1983 but failed to disclose that fact in its applications.  *Id.* at 1300.

Next, the district court considered the Lanham Act claims, beginning with the infringement allegation.  Because four marks had been canceled for fraud, this required only an examination of Plaintiff Order's design mark, Registration No. 2,799,898.  The district court found that Plaintiff Order's registered mark was visually dissimilar from The Florida Priory's mark and, therefore, ruled there was no likelihood of confusion between the two.  *Id.* at 1301.  Regarding the false advertising claim, the district court decided that The Florida Priory could not be held liable for false statements because it did, in fact, share a pre-1798 history with Plaintiff Order.  *Id.* at 1301–02.

On the state law claims, the district court evaluated the unfair competition

---

[10] These marks were Registration Nos. 2,783,933 ("SOVEREIGN MILITARY HOSPITALLER ORDER OF ST. JOHN OF JERUSALEM OF RHODES AND OF MALTA"); 2,783,934 ("KNIGHTS OF MALTA"); 2,915,824 ("HOSPITALLERS OF ST. JOHN OF JERUSALEM"); and 3,056,803 ("ORDER OF ST. JOHN OF JERUSALEM").

14

claims with regard to the marks it had canceled and found no likelihood of confusion. *Id.* at 1302. Because it found no likelihood of confusion between either of the parties' marks and no merit to the false advertising claim, the district court denied Plaintiff Order's FDUTPA claim. *Id.* at 1303.

## II.    Standard of Review

"After a bench trial, we review the district court's conclusions of law *de novo* and the district court's factual findings for clear error." *Proudfoot Consulting Co. v. Gordon*, 576 F.3d 1223, 1230 (11th Cir. 2009). Specifically, we review for clear error the district court's findings that a mark was procured by fraud, *Citibank, N.A. v. Citibanc Grp., Inc.*, 724 F.2d 1540, 1544 (11th Cir. 1984), and that two marks are not likely to be confused, *Dieter v. B & H Indus. of Sw. Fla., Inc.*, 880 F.2d 322, 325 & n.2 (11th Cir. 1989). In the context of a false advertising claim, we similarly review for clear error the district court's conclusion that a statement is not false. *Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1309 (11th Cir. 2010).

## III.    Discussion

Plaintiff Order raises multiple issues on appeal. First, it contests the cancellation of four registered service marks, which the district court found were procured by fraud. Plaintiff Order also contends that the district court committed reversible error in evaluating the merits of its Lanham Act infringement and false

15

advertising claims, as well as its state law claims.  We address each in turn.

### A.    Fraud on the PTO

At any time, a party may petition to cancel a registered mark on the ground

that the registration was procured by fraud, even if that mark has become

incontestable.  15 U.S.C. §§ 1064(3), 1119.  An applicant commits fraud when he

"knowingly makes false, material representations of fact in connection with an

application for a registered mark."  *Angel Flight of Ga., Inc. v. Angel Flight Am.,*

*Inc.*, 522 F.3d 1200, 1209 (11th Cir. 2008).  Fraud further requires a purpose or

intent to deceive the PTO in the application for the mark.  *In re Bose Corp.*, 580

F.3d 1240, 1243, 1245 (Fed. Cir. 2009); *see also Angel Flight*, 522 F.3d at 1210–

11 (affirming cancellation on the basis of the applicant's purposeful failure to

disclose a superior user of the mark).  The party seeking cancellation on the basis

of fraud must prove its claim by clear and convincing evidence.  *Angel Flight*, 522

F.3d at 1209.  This is necessarily a heavy burden, and "any doubt must be resolved

against the charging party."  *Bose*, 580 F.3d at 1243.

The district court found that Plaintiff Order committed fraud on the PTO

through execution of the oath that accompanies a service mark application, which

requires the applicant's representative—in this case Dean Francis Pace—to attest

to the following:

16

The undersigned, being hereby warned that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. § 1001, and that such willful false statements may jeopardize the validity of the application or any resulting registration, declares that he/she is properly authorized to execute this application on behalf of the applicant; he/she believes the applicant to be the owner of the trademark/service mark sought to be registered, or, if the application is being filed under 15 U.S.C. § 1051(b), he/she believes applicant to be entitled to use such mark in commerce; to the best of his/her knowledge and belief no other person, firm, corporation, or association has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive; and that all statements made of his/her own knowledge are true; and that all statements made on information and belief are believed to be true.

(D.E. 127-2, 37); *see also* 15 U.S.C. § 1051(a)(3) (setting forth the applicant's verification requirements); 6 McCarthy on Trademarks § 31:75 (4th ed. 2012) ("The type of fraud allegation that has given rise to the largest number of cases is the charge that registrant signed the application oath knowing of use of the mark by others. . . . While such charges of fraud and nondisclosure have uniformly been rejected, litigants continue to pursue them vigorously . . . ."). The district court explained that Pace was *personally unaware* of the existence of The Ecumenical Order at the time he signed the applications and the accompanying oath. *Sovereign Military Hospitaller*, 816 F. Supp. 2d at 1298, 1300.

Nonetheless, the district court canceled Plaintiff Order's registered word marks based on Plaintiff Order's failure to disclose the existence of The

17

Ecumenical Order to the PTO.  According to the district court, Plaintiff Order

knew of The Ecumenical Order's domestic presence as early as 1983 and had a

duty to disclose that fact in the application.  The district court based this finding of

knowledge on (1) the 1983 letter, written on The Ecumenical Order's official

letterhead, sent to Plaintiff Order's headquarters abroad; (2) the letter from Stair

Sainty to a member of The Ecumenical Order challenging its claimed connection

to Plaintiff Order; and (3) the letter from de Merode to The Ecumenical Order

expressing the view that the latter organization could dub knights.[11]

To prove the fraud claim based on misrepresentations in the declaration

oath, The Florida Priory was required to establish that Pace "was aware other

organizations were using the . . . mark (either in an identical form or a near

resemblance) and 'knew or believed' those other organizations had a right to use

the mark." *Angel Flight*, 522 F.3d at 1211 (analyzing a similar declaration).  The

declarant-focused text of the application oath requires the signatory's good-faith,

subjective belief in the truth of its contents.  *See, e.g.*, *Bose*, 580 F.3d at 1245

("Subjective intent to deceive . . . is an indispensable element in the [fraud]

analysis."); *Marshak v. Treadwell*, 240 F.3d 184, 196 (3d Cir. 2001) ("[A]pplicants

---

[11] Although it is questionable whether these facts even establish that Plaintiff Order *as an institution* knew of the existence of The Ecumenical Order, we need not address the validity of these factual findings because the fraud claim fails even accepting that Plaintiff Order knew of The Ecumenical Order.

18

attest[] only to their own subjective knowledge and belief."); *United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 205 F.3d 1219, 1227 (10th Cir. 2000) ("[W]e focus on the 'declarant's subjective, "honestly held, good faith" belief.'" (quoting *San Juan Prods., Inc. v. San Juan Pools, Inc.*, 849 F.2d 468, 472 (10th Cir. 1988))); *see also* 6 McCarthy on Trademarks § 31:76 ("The oath is phrased in terms of a subjective *belief* such that it is difficult, if not impossible, to prove objective falsity and fraud so long as the affiant or declarant has an honestly held, good faith belief."). This requirement is implicit in our holding in *Angel Flight*, where we upheld a district court's cancellation of a mark because the declarant purposefully failed to disclose the right of others to use the mark at issue "even though *he* was aware organizations throughout the country were using the [mark] and had a right to do so." 522 F.3d at 1210 (emphasis added). Unlike the situation in *Angel Flight*, Pace had no awareness that any other organization was using the marks for which Plaintiff Order sought federal protection. This fact alone compels reversal of the fraud finding, as Pace could not have intended to deceive the PTO in attesting to an oath that he believed was entirely accurate.[12]

---

[12] We find it curious that the district court canceled four of Plaintiff Order's marks even though it found that they were not likely to be confused with those of The Florida Priory. *See Sovereign Military Hospitaller*, 816 F. Supp. 2d at 1302–03. We have explained that fraud requires a showing that the applicant's representative knew that other organizations were using the mark "either in an identical form or a near resemblance." *Angel Flight*, 522 F.3d at 1211; *see also Coach House Rest. v. Coach & Six Rests.*, 934 F.2d 1551, 1559 (11th Cir. 1991) (noting that

To support its finding of fraud, the district court analogized to the Supreme Court's recent decision in *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. ___, 131 S. Ct. 2060 (2011). *Global-Tech* considered whether knowledge of infringement was required to sustain a claim that a party actively induced infringement of a patent under 35 U.S.C. § 271(b). *Id.* at 2063. The Supreme Court held that knowledge, rather than deliberate indifference, was required to sustain a claim under § 271 and that "willful blindness" was sufficient to satisfy that knowledge element. *Id.* at 2068. Utilizing this concept, the district court explained that "[t]o the extent that a willful blindness standard applies here, the Court concludes that [Plaintiff Order]'s failure to inform Pace of the existence of [T]he Ecumenical Order is evidence of willful blindness on [Plaintiff Order]'s part." 816 F. Supp. 2d at 1300.

It was error to look to this case for the applicable standard to analyze a claim for fraud on the PTO. We have been admonished to exercise caution before importing standards from one area of intellectual-property law into another. *See*

a petitioner seeking to cancel a mark must prove "that the registered mark resembles petitioner's mark"). This requirement is based on the explicit language of the oath, in which the declarant affirms that "to the best of his/her knowledge and belief no other [entity] has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive." Thus, even if Pace actually knew about other organizations using the mark—which he indisputably did not—the district court's own finding on the confusion issue is inconsistent with its disposition of the fraud claim.

20

*Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 439 n.19, 104 S. Ct. 774, 787 (1984).  The Florida Priory has not pointed to any authority to establish the sort of "historic kinship" that may justify translation of a patent-infringement standard into the mark-application context.  *Id.* at 439, 104 S. Ct. at 787; *see also United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97, 39 S. Ct. 48, 50 (1918) (noting "little or no analogy" between trademark rights and those of patent or copyright); *McLean v. Fleming*, 96 U.S. 245, 254 (1877) ("Property in the use of a trade-mark . . . bears very little analogy to that which exists in copyrights or in patents for new inventions or discoveries . . . .").  The Florida Priory does not make an argument to otherwise justify the district court's use of this standard.  To the extent the district court relied on the inapplicable "willful blindness" standard to find the required intent to deceive the PTO, it erred.[13]

There is one additional aspect of the fraud analysis that the district court did not address.  If the declarant subjectively believes the applicant has a superior right to use the mark, there is no fraud, even if the declarant was mistaken.  *See Bose*, 580 F.3d at 1246 ("There is no fraud if a false misrepresentation is occasioned by

---

[13] In this context, the district court also wrote that "[e]ven if [Plaintiff Order] disputes actual knowledge, no adequate explanation has been offered for [its] subjective ignorance" of The Ecumenical Order and The Florida Priory.  *Sovereign Military Hospitaller*, 816 F. Supp. 2d at 1300.  Analyzing the information that Plaintiff Order or Pace "should have known" impermissibly lowers the standard for fraud on the PTO, which contemplates the honestly held, good-faith belief of the declarant.  *See Bose*, 580 F.3d at 1244.

21

an honest misunderstanding or inadvertence without a willful intent to deceive.").

Here, The Florida Priory did not put forth any evidence to establish that Pace—or

Plaintiff Order, for that matter—knew or believed that The Ecumenical Order or

The Florida Priory had a superior right to the marks at issue.  *See Angel Flight*, 522

F.3d at 1211; *Citbank*, 724 F.2d at 1545 (rejecting a defendant's fraud claim where

the plaintiff was the "senior use[r] of th[e] term"); *see also Sovereign Order of*

*Saint John v. Grady*, 119 F.3d 1236, 1241 (6th Cir. 1997) ("[A] valid trademark

registration requires only that the registrant 'believe' himself to be the owner of the

mark." (quoting 15 U.S.C. § 1051)).  Even assuming knowledge of The

Ecumenical Order as of 1983, Plaintiff Order's relevant service mark registrations

provide that the marks were first used in commerce in 1926 and 1927.[14]  The bare

knowledge that The Ecumenical Order existed as of 1983 does not undermine

Plaintiff Order's claim to be the senior user of those marks because, even knowing

of The Ecumenical Order's existence, Plaintiff Order could justifiably believe that

its marks were superior based on their first use dating back to the 1920s.  *See Star*

*Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1366 (Fed. Cir. 2008)

(explaining that even though circumstantial evidence may be used to prove intent,

the evidence "must still be clear and convincing, and inferences drawn from lesser

---

[14] Registration Nos. 2,783,933 and 2,783,934 listed a date of December 31, 1926.
Registration Nos. 2,915,824 and 3,056,803 listed April 28, 1927.

22

evidence cannot satisfy the deceptive intent requirement"). In any event, The Florida Priory failed to proffer any evidence to show that Pace (or Plaintiff Order) believed that The Ecumenical Order had a right to use the objected-to marks in commerce. This is fatal to the claim of fraud. *See Angel Flight*, 522 F.3d at 1210.[15]

In sum, the district court clearly erred in finding that Plaintiff Order fraudulently obtained its marks. The district court's evaluation of the fraud claim was factually unsupported and legally incorrect, and we reverse the cancellation of the four marks.

### B.　　Lanham Act Infringement

Plaintiff Order next challenges the district court's finding that its registered design service mark was not confusingly similar to the identifying design used by The Florida Priory. The Lanham Act prohibits the unauthorized use of a mark in commerce that is confusingly similar to a registered service mark. 15 U.S.C. § 1114(1)(a). To prevail on a civil infringement claim brought under 15 U.S.C. § 1125, a plaintiff must establish that (1) its mark is entitled to protection and (2)

---

[15] It is also worth pointing out that, looking at the broader picture, no entity in this scenario has even been misled by the purported nondisclosure at issue. When Plaintiff Order applied for federal service mark protection, the examining attorney at the PTO found a mark registered by The Delaware Corporation—an entity associated with The Ecumenical Order—and required Plaintiff Order to distinguish itself from that prior registration, which Plaintiff Order successfully did. The PTO therefore knew about the prior uses that Pace and Plaintiff Order allegedly withheld from it, removing the possibility that the PTO was misled by the application.

23

the defendant "adopted an identical or similar mark such that consumers were likely to confuse the two." *Int'l Stamp Art, Inc. v. United States Postal Serv.*, 456 F.3d 1270, 1274 (11th Cir. 2006) (per curiam).  In determining whether two marks are likely to be confused, the district court must consider seven factors: (1) the type of mark, (2) the similarity of the marks at issue, (3) the similarity of the services the marks represent, (4) the similarity of the parties' service outlets and customers, (5) the nature and similarity of the parties' advertising media, (6) the defendant's intent, and (7) any actual confusion.  *Frehling Enters. v. Int'l Select Group, Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999); *Coach House Restaurant, Inc. v. Coach & Six Restaurants, Inc.*, 934 F.2d 1551, 1561 (11th Cir. 1991).  "The extent to which two marks are confusingly similar cannot be assessed without considering all seven factors to ensure that the determination is made in light of the totality of the circumstances." *Wesco Mfg., Inc. v. Tropical Attractions of Palm Beach, Inc.*, 833 F.2d 1484, 1488 (11th Cir. 1987).  At the same time, we recognize that a district court need not "specifically mention each of the seven factors in order to avoid reversal on appeal." *Univ. of Ga. Athletic Ass'n v. Laite*, 756 F.2d 1535, 1542 (11th Cir. 1985); *see also Wesco Mfg.*, 833 F.2d at 1489 ("[W]e may affirm an ultimate finding on the issue of confusion that is not clearly erroneous, even when the district court fails to consider all seven factors.").  Ultimately, our ability to

24

consider the district court's likelihood-of-confusion determination depends on whether the lower court found sufficient facts to permit meaningful appellate review. *See Wesco Mfg.*, 833 F.2d at 1489. If it has not, then we may remand for the district court to conduct the proper analysis. *Id.*

In evaluating whether Plaintiff Order's service mark was likely to be confused with The Florida Priory's unregistered symbol, the district court described the visual appearance of the two graphics and then stated: "The Florida Priory's design contains two crosses, whereas [Plaintiff Order]'s registered mark contains only one. [Plaintiff Order]'s mark contains no crown. These marks are easily distinguishable, thus removing any possibility for consumer confusion." *Sovereign Military Hospitaller*, 816 F. Supp. 2d at 1301. Thus, it appears as though the district court's entire analysis of the likelihood of confusion was based on the visual dissimilarity of the marks—namely that The Florida Priory's symbol contained a cross and crown that Plaintiff Order's mark did not. The district court did not make any additional factual findings related to the infringement claim or address the applicability (or inapplicability) of any other factor germane to the infringement analysis.

It is beyond any real dispute that the district court erred in focusing "solely on the degree of visual similarity between the two marks." *Wesco Mfg.*, 833 F.2d

25

at 1489. The other factors bearing on the likelihood of confusion are "[e]qually as significant as the general appearance of the trademarks." *Sun-Fun Prods., Inc. v. Suntan Research & Dev., Inc.*, 656 F.2d 186, 189 (5th Cir. Unit B Sept. 17, 1981) (quotation omitted). As such, when a district court "completely disregard[s] the proper analysis" in making its determination of confusion, we may vacate its ruling and remand for consideration of the claim using the proper framework. *See Wesco Mfg.*, 833 F.2d at 1489. Here, because the district court did not make any additional factual findings to aid us in evaluating whether it committed clear error, we have an "insufficient basis" to evaluate its ultimate conclusion. *Id.* As a result, we remand the infringement claim so the district court may conduct the proper, multi-factor infringement analysis for the design marks.[16] The district court should also conduct this analysis for Plaintiff Order's word marks, which were improperly canceled for fraud.

### C.    Lanham Act False Advertising

Under the Lanham Act, an entity that misrepresents the "nature, characteristics, qualities, or geographic origin" of its services in commercial advertising or promotion is liable to the persons damaged by the false or misleading representation. 15 U.S.C. § 1125(a)(1). We have interpreted this

---

[16] We express no opinion with regard to the ultimate outcome of this claim.

26

language to require a plaintiff to demonstrate that: (1) the defendant's statements were false or misleading; (2) the statements deceived, or had the capacity to deceive, consumers; (3) the deception had a material effect on the consumers' purchasing decision; (4) the misrepresented service affects interstate commerce; and (5) it has been, or likely will be, injured as a result of the false or misleading statement. *See Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002).

Plaintiff Order's false advertising claim was based on its position that The Florida Priory does not share any history with, and has no connection to, the historic Order of Malta. It argues that The Florida Priory's adoption of Plaintiff Order's pre-1798 historical lineage and corresponding record of charitable activities is likely to deceive customers into contributing money to The Florida Priory. In assessing this claim, the district court was faced with the monumental task of adjudicating the accuracy of two competing versions of late-eighteenth-to-early-nineteenth century history. The testimony of Plaintiff Order's witnesses advised that The Ecumenical Order—and therefore The Florida Priory—had no connection to Plaintiff Order and that no split ever occurred in the long history of Plaintiff Order as an organization. (D.E. 144, 39:5–7; D.E. 145, 124:7–10.) The testimony of The Florida Priory's witnesses, however, sought to establish that as a

27

result of Napoleon's 1798 invasion of Malta, the original Order of Malta essentially ceased to exist. They advised that other religious orders connected to that parent group sprung up, two of which are Plaintiff Order and The Ecumenical Order. In their eyes, The Florida Priory connects to The Ecumenical Order, which connects to the original Knights of Malta, just as Plaintiff Order is connected to the original Knights of Malta.

The district court essentially agreed with the version of history as presented by The Florida Priory and, specifically, by Papanicolaou. On appeal, Plaintiff Order argues that its witnesses, rather than those of The Florida Priory, accurately recited the relevant history. It attributes error to the district court's reliance on the testimony of Papanicolaou—who did not hold himself out to be an expert in history—over the testimonies of Gamble and Dr. Vann—only one of whom was qualified as an expert in the history of the Order of Malta. We conclude that the district court did not clearly err in its factual findings and therefore affirm its disposition of the false advertising claim.

The main thrust of Plaintiff Order's argument is that Papanicolaou's testimony was based on his own view of history rather than any reliable evidence. It is true that Papanicolaou did not testify as an expert historian.[17] He did testify,

---

[17] We note that the district court never actually ruled on Plaintiff Order's objection to

28

though, as Prince Grand Master of The Ecumenical Order and presented history-related testimony in much the same way Gamble did as Plaintiff Order's representative. (D.E. 144, 35:2–4.) Papanicolaou stated that he possessed the archives of The Ecumenical Order; that he had read history books concerning the organization; and that he had previously seen the records of The Ecumenical Order, which are located in the United Kingdom, Malta, Canada, the United States, and Sweden. (D.E. 146, 17:8–18:4.) He testified that he had seen some of his organization's post-1798 records in Russia. (*Id.* at 18:19–22.) The Florida Priory submitted to the district court the texts that Papanicolaou relied upon in arriving at his historical narrative. The district court took notice of their existence, stating "I may browse through th[e books], but I wouldn't want to represent that I know everything." (*Id.* at 16:2–19.) The Florida Priory also submitted the minutes of the 1908 meeting of The Ecumenical Order in New York, which tend to support

---

Papanicolaou's testimony. The relevant colloquy is as follows:

> [Counsel]: And, Your Honor, we object. The witness has not been qualified to testify as an historian.
>
> THE COURT: Well, you'll be able to cross-examine him on this. I don't know if he's looked at original records and documents, but I'll let him testify.

(D.E. 146, 17:8–12.) The objection was not renewed so as to permit the district court an opportunity to definitively rule on the propriety of the testimony or whether it was even expert in nature.

29

Papanicolaou's version of events.[18]  We are reluctant to conclude here that the head of an organization is incompetent to testify about the history of the organization, especially when the opposing party had the opportunity to fully cross-examine and challenge his credibility on all aspects of his testimony.  In fact, Plaintiff Order, upon whom the burden of proof rested, itself relied upon its own non-expert—Geoffrey Gamble—to testify as an historian.  (D.E. 144, 37:11–40:19.)

Plaintiff Order contends that the district court must be reversed because the testimony of its expert witness directly contradicts Papanicolaou's account of the historical events that occurred around 1798.  Although it is true that the witnesses presented contrasting views of history, we cannot say that the district court clearly erred.  To be sure, both Gamble and Dr. Vann testified that they did not see any connection between The Ecumenical Order and Plaintiff Order.  (D.E. 144, 39:2–15; D.E. 145, 128:12–22, 129:14–18.)  On cross-examination, however, Dr. Vann testified that she did not have any records from Russia after 1798, (D.E. 145, 131:5–6), had not gone to Russia to look at records, (*id.* at 131:7–8), and had not

---

[18] The minutes state that the attendees gathered "for the purpose of officially organizing, maintaining and perpetuating a Grand Priory of the Order of the Knights of Malta in these United States of America, continuing with certain modifications, the Sovereign Order of Saint John of Jerusalem as it was constituted under the 70th Grand Master, H.I.M. Paul I, Emperor of Russia." (D.E. 25-11 Exh. 16.)

30

asked to see The Ecumenical Order's records, (*id.* at 131:8–10).  Dr. Vann also testified that the book upon which she relied was published by Plaintiff Order.  (*Id.* at 132:12–20.)

Faced with all of this information, the district court's decision was ultimately a matter of credibility in light of the documentary evidence presented. On the one hand, the district court had Papanicolaou, the head of The Ecumenical Order, who had read books and reviewed documents concerning the history of his organization.  The district court also had the testimony of Joyner, a member of The Ecumenical Order, who had written a book based on his account of what he had read regarding his organization's history.  On the other hand, there was Dr. Vann, who has devoted her life to the study of Plaintiff Order and has reviewed original documents and published texts concerning its history.  In addition, the district court had the testimony of Gamble, who had published a historical booklet concerning Plaintiff Order.  (D.E. 144, 40:17–19.)  The district court, as is its prerogative when conducting a bench trial, weighed the testimony and came to a conclusion. *See Castle v. Sangamo Weston, Inc.*, 837 F.2d 1550, 1559 (11th Cir. 1988) ("Assessing the weight of evidence and credibility of witnesses is reserved for the trier of fact.").  The cross-examination of Dr. Vann gives some basis for the district court's apparent reluctance to accept that testimony as a definitive statement of

31

history, and there was no documentary evidence submitted that would otherwise satisfy Plaintiff Order's burden of proving the absence of a connection between the groups.  In the context of this bench trial, the district court chose from one of two positions, each of which was supported by trial testimony.

The federal courts do not sit as a final arbiter of historical fact, and a serious scholar would probably be reluctant to cite to a district court's findings of fact as a definitive statement of history.  Instead, the district court evaluates a case by considering the evidence presented to it.  After carefully considering the trial transcript, we are not left with the "definite and firm conviction that a mistake has been committed." *Johnson & Johnson*, 299 F.3d at 1246.  Although the factual findings of the district court might not be the same as those that we would have made if presented with the same evidence, that alone does not provide a basis for reversal.  *See Anderson v. Bessemer City*, 470 U.S. 564, 573–74, 105 S. Ct. 1504, 1511 (1985) ("If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.").  In the absence of any definitive evidence that establishes that the parties are not connected, we must affirm the district court's disposition of this claim.

32

Although Plaintiff Order's trial objection preserved for appeal whether Papanicolaou was qualified to testify as a historian, *see supra* note 17, Plaintiff Order's initial brief fails to address this argument. The brief merely mentions that Papanicolaou's testimony "was not based on personal knowledge." That portion of one sentence buried within thirty-six pages of legal argument fails to carry the weight that the dissent seeks to attribute to it. Plaintiff Order makes no argument that Papanicolaou had to be qualified as an expert in order to testify about the history of The Ecumenical Order. Plaintiff Order does not cite to even one of the Federal Rules of Evidence, much less Rule 702 governing expert testimony. There is no mention of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786 (1993), or any allegation that the district court failed in its role as gatekeeper. Nor is there a citation to any case that considered the exclusion of non-expert testimony. Arguments not raised in a party's initial brief are "considered abandoned." *United States v. Dockery*, 401 F.3d 1261, 1262–63 (11th Cir. 2005). We are reluctant to reverse a district court "pursuant to legal theories [the plaintiff] did not outline, based on facts [the plaintiff] did not relate." *Adler v. Duval Cnty. Sch. Bd.*, 112 F.3d 1475, 1481 n.12 (11th Cir. 1997). An appellate court "has no duty to research and construct legal arguments available to a party." *Head Start Family Educ. Program, Inc. v. Coop. Educ. Serv. Agency*, 46 F.3d 629,

33

635 n.9 (7th Cir. 1995).

### D.    State Law Unfair Competition and FDUTPA

The success of Plaintiff Order's state unfair competition and FDUTPA claims is tied to the federal Lanham Act claims for infringement and false advertising. *See Natural Answers, Inc. v. Smithkline Beecham Corp.*, 529 F.3d 1325, 1333 (11th Cir. 2008). Because we vacate the ruling on the infringement claim as related to the design mark and remand for reconsideration utilizing the multifactor test, we likewise vacate the district court's conclusions with regard to the analogous state claims.

Next, because we reverse the district court's cancellation of the registered word marks, we also vacate the portion of the district court's order disposing of the state claims based on these word marks so it has the opportunity to revisit them based on a complete analysis under the correct standard. In conducting this analysis, we caution the district court to limit its analysis to facts in the record and to refrain from consulting outside sources on the Internet that have not been cited, submitted, or recognized by the parties. Remand is proper here because it is unclear to what extent the district court relied on its own, extra-record Internet research into similarly named organizations, *see Sovereign Military Hospitaller*, 816 F. Supp. 2d at 1303 & n.14, to conclude that The Florida Priory's unregistered

34

marks are not likely to be confused with Plaintiff Order's word marks. *See Johnson v. United States*, 780 F.2d 902, 910 (11th Cir. 1986) ("The trial judge may not . . . undertake an independent mission of finding facts 'outside the record of a bench trial over which he [presides].'" (quoting *Price Bros. Co. v. Phila. Gear Corp.*, 629 F.2d 444, 447 (6th Cir. 1980)) (second alteration in original)). The websites that the district court identified were proffered by neither party, and Plaintiff Order had no opportunity to contest the validity of the information contained therein, rendering it an improper consideration in the confusion analysis.[19]

### E.    Reassignment on Remand

In its briefing and at oral argument, Plaintiff Order brought to our attention instances from the bench trial and the district court's published findings of fact that disparage the parties, witnesses, or their work. In its findings of fact, the district court wrote that, although it understood that the parties presented themselves as Christian charities, it "struggle[d] with the parties' characterizing themselves in that manner." *Sovereign Military Hospitaller*, 816 F. Supp. 2d at 1294 n.2. The district court attributed this confusion to the "unimpressive" amount of money each group raised for charitable purposes, which led the court to believe that the

---

[19] Again, we express no opinion on the ultimate outcome of these state law claims.

35

members of both organizations "are more interested in dressing up in costumes, conferring titles on each other and playing in a 'weird world of princes and knights' than in performing charitable acts." *Id.* (quoting the judge's comments in the trial transcript, D.E. 144, 131:19–20). During the trial, the judge opined that it was "tragic" that all Dr. Vann had done in her life was study the Knights of Malta and their records. (D.E. 145, 8:1–6.) He also expressed his disbelief that two charitable organizations would spend their time and money on litigation. (D.E. 144, 34:5–7.)

These remarks are wholly inappropriate in the context of a judicial proceeding and a published judicial opinion. Although a judge is not required to check his or her sense of humor at the courthouse door, we must be mindful that the parties rely on the judge to give serious consideration to their claims. Litigants are understandably frustrated when they are subject to the sort of unnecessary belittling commentary about which the parties complain here.

Plaintiff Order seeks to invoke our supervisory authority to reassign this case to a different district judge on remand. *See United States v. Torkington*, 874 F.2d 1441, 1446 (11th Cir. 1989) (per curiam). We have explained that reassignment is proper when a "trial judge has engaged in conduct that gives rise to the appearance of impropriety or a lack of impartiality in the mind of a reasonable member of the

36

public." *Id.* In the absence of bias, we consider three factors in determining whether reassignment is justified: "(1) whether the original judge would have difficulty putting his previous views and findings aside; (2) whether assignment is appropriate to preserve the appearance of justice; [and] (3) whether reassignment would entail waste and duplication out of proportion to gains realized from reassignment." *Id.* at 1447. We think the district court's remarks, though offensive to both parties, do not rise to the level of conduct that warrants assignment to a different judge on remand. We are hard-pressed to surmise actual bias in favor of, or against, one party over the other. Moreover, we are confident that, on remand, both parties will be treated with the respect they deserve and that the district court will be able to freshly consider the remanded claims notwithstanding its previously expressed views. And, given the fact-intensive nature of this case, any reassignment would necessarily require duplication of resources expended by the parties and the court. Accordingly, we deny Plaintiff Order's request for reassignment on remand.

## IV.   Conclusion

We conclude that the district court clearly erred in evaluating the claim that Plaintiff Order committed fraud on the PTO and reverse the cancelation of the four word marks, Registration Nos. 2,783,933; 2,783,934; 2,915,824; and 3,056,803.

37

Because we were not presented with sufficient findings to review the Lanham Act infringement claims, we vacate the district court's ruling on that issue and remand for it to consider, under the correct legal standard, confusion with respect to all of Plaintiff Order's marks—including the four word marks.  In light of that disposition, we vacate the district court's ruling on the state law claims.  Finally, we affirm the district court's finding on the Lanham Act false advertising claim in favor of The Florida Priory.

**AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART, AND REMANDED.**

PRYOR, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority opinion with the exception of the resolution of the evidentiary issues as they relate to the claim of false advertising, from which I respectfully dissent. The district court rejected the claim of false advertising based on a finding that the Sovereign Military Order and the Florida Priory share a history, and the district court based that finding on the testimony of Nicholas Papanicolaou. Special dangers attend the introduction of testimony about history in judicial proceedings. "[W]hen a historian, whose methodology is unsound, is placed before a [factfinder], the historian has the ability to paint a picture of the past as he or she so desires. And this, in turn, has the potential to change and shape the way the public views, interprets, and understands the past." Holly Morgan, Comment, Painting the Past and Paying for It: The Demise of Daubert in the Context of Historian Expert Witnesses, 44 Wake Forest L. Rev. 265, 294–95 (2009). The district court clearly erred when it found that the Sovereign Military Order and the Florida Priory share a history prior to 1798 because no competent evidence supports that finding.

Under the Federal Rules of Evidence, three types of testimony are admissible in federal court. First, a witness may testify about a matter if he has

personal knowledge of that matter. Fed. R. Evid. 602. Second, a witness who is not testifying as an expert may offer opinion testimony if the opinion is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. Third, a "witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if" four conditions described in Rule 702 are established.  Fed. R. Evid. 702.

The Florida Priory understandably does not argue that Papanicolaou had personal knowledge of any of the events between 1798 and the early twentieth century that were the subject of his testimony. Papanicolaou's testimony about the arcane history concerning the evolution of the Ecumenical Order from the original Knights of Malta instead would have to be based on "specialized knowledge" of history. Accordingly, the rules regarding expert opinion governed the admissibility of Papanicolaou's testimony about history, but this district court considered Papanicolaou's testimony without qualifying him as an expert.

Contrary to the assertion in the majority opinion, the Sovereign Military Order did not abandon its argument that Papanicolaou's testimony was

40

inadmissible. The Sovereign Military Order devoted over five pages of its initial

brief to the argument that the district court erred when it rejected the claim of false

advertising based on a finding that the parties had a shared history. The Sovereign

Military Order explained as follows that no competent evidence supported that

finding:

> There is no factual support in the record for concluding that the
> Order and the Priory have a shared history prior to 1798, or, indeed,
> any shared history at all.  And because there was <u>no</u> evidence to
> support the court's shared-history finding, there certainly was not the
> substantial evidence necessary for this Court to affirm that finding.
>
> More than this, the trial record lacks any reliable evidence
> speaking to the history of the [Ecumenical Order] and the [Florida]
> Priory, a separate matter from whether that history is shared with the
> Order. The statements in the District Court opinion outlining the
> [Ecumenical Order]'s history rely on two primary sources: the trial
> testimony of Mr. Papanicolaou, the Priory's head, and the pre-trial
> declaration of Mr. Papanicolaou. First of all, Mr. Papanicolaou's
> submissions establish no more than Mr. Papanicolaou's view of
> history. The evidence he offered at trial with respect to the history of
> the EO and the Priory was not based on personal knowledge. The
> same is true of his pre-trial declaration, which was not admitted at
> trial and—as a result—was improperly relied on by the District Court.
> And, in any event, Mr. Papanicolaou's unsubstantiated statements
> were flatly contradicted by the trial testimony of the Order's historical
> expert and evidence submitted at trial.

Initial Brief of Sovereign Military Order at 47−48 (citations omitted). The

Sovereign Military Order also explained at length in its reply brief that no

admissible evidence supported the finding of the district court that the Florida

Priory and the Sovereign Military Order share a history before 1798:

> The District Court summarily rejected the false designation of origin
> claim as a "non-starter" concluding that "[r]eferences by the Florida
> Priory to a shared history with [the Order] are perfectly appropriate, as
> the organizations shared a history prior to 1798." But there was no
> persuasive evidence offered to support this conclusion, let alone the
> substantial evidence necessary to affirm this factual finding under the
> clearly erroneous standard on appeal.
>
> . . .
>
> [T]he [Florida] Priory's account of history is based primarily on the
> testimony its head.  But Mr. Papanicolaou is no more qualified to
> render judgment on the proper construction of history than any other
> person who has a read a history book. Moreover, his testimony was
> based primarily on his "memory," and he admitted that his historical
> testimony was not based on a review of "any original documents," but
> "books and bibliography[ies]."

Reply Brief of Sovereign Military Order at 19, 23 (citation omitted) (alteration in

original).

The majority states that the Sovereign Military Order makes no argument

that Papanicolaou had to be qualified as an expert in order to testify about the

history of the Ecumenical Order, Majority Opinion at 33, but that assertion

misapprehends both the briefs and the record. The majority acknowledges that the

Sovereign Military Order objected at trial that Papanicolaou was not qualified as

an expert in history and that the Sovereign Military Order argues on appeal that

42

Papanicolaou lacked personal knowledge to offer testimony regarding historical events that occurred long before he was born. What the majority fails to grasp is that these objections represent two sides of the same coin: an objection that a witness is not qualified as an expert is necessarily an objection that a witness lacks personal knowledge of the subject matter of his testimony, and an objection that a witness lacks personal knowledge is an objection that the witness can testify only if he is qualified as an expert or can offer lay opinion testimony. The Sovereign Military Order did not abandon its argument that Papanicolaou was not qualified as an expert to testify about the history of the Knights of Malta by arguing in its opening brief that Papanicoloau lacked personal knowledge to testify about that history. The district court admitted Papanicoloau's testimony, over the objection of the Sovereign Military Order, even though the district court did not qualify him as an expert witness, and the Sovereign Military Order argues on appeal that Papanicolaou's non-expert testimony is inadmissible because it is not based on personal knowledge.

And contrary to the argument of the majority opinion, the Sovereign Military Order was not required to "renew[]" its objection "so as to permit the district court an opportunity to definitively rule on the propriety of the testimony or whether it was even expert in nature." Majority Opinion at 28−29, n.17. Federal

Rule of Civil Procedure 46 provides that "[a] formal exception to a ruling or order is unnecessary. When the ruling or order is requested or made, a party need only state the action that it wants the court to take or objects to, along with the grounds for request or objection." Fed. R. Civ. P. 46. We long ago did away with the common law requirement of formal exceptions to the rulings of trial courts.

The majority also faults the Sovereign Military Order for failing to cite a Federal Rule of Evidence to support the elementary proposition that a witness ordinarily must have personal knowledge of the subject of his testimony, Majority Opinion at 33, but this argument does not turn on an interpretation of any Rule of Evidence. It is undisputed that Papanicolaou lacked personal knowledge about the subject of his testimony.

Hinting that two wrongs make a right, the majority obliquely suggests that we should overlook any error in admitting Papanicolaou's testimony because the Sovereign Military Order called Geoff Gamble who offered testimony about the history of the Knights of Malta even though he was not qualified as an expert in history. But the Florida Priory did not object to Gamble's testimony about history, and the district court did not rely on Gamble's testimony when it found that the Sovereign Military Order and the Florida Priory share a history before 1798. Whether the district court abused its discretion when it admitted Gamble's

44

testimony might be at issue if the Florida Priory had made an appropriate objection to that testimony at trial and the district court had relied on Gamble's testimony to find that the Sovereign Military Order proved that the two organizations did not share a history before 1798, but this appeal does not present that issue.

The district court abused its discretion when it admitted Papanicolaou's testimony based on "specialized knowledge" without qualifying him as an expert or ensuring that his testimony was reliable. The Sovereign Military Order objected at trial that Papanicolaou had "not been qualified to testify as an historian," but the district court disregarded that objection and permitted Papanicolaou to testify concerning the history of the Ecumenical Order and the Knights of Malta. "[W]hen a party offers expert testimony and the opposing party raises a . . . challenge [under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786 (1993)], the trial court must 'make certain that [the] expert, whether basing [his] testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" McClain v. Metabolife Int'l, Inc., 401 F.3d 1233, 1237 (11th Cir. 2005) (alterations added) (quoting Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152, 119 S. Ct. 1167 (1999)). The district court makes this determination by applying Rule 702. See id. Rule 702 permits a district court

45

to admit expert testimony if it finds that "the expert's . . . specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," "the testimony is based on sufficient facts or data," "the testimony is the product of reliable principles and methods," and "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. Although "the task of evaluating the reliability of expert testimony is uniquely entrusted to the district court" and "we give the district court considerable leeway in the execution of its duty[,] [w]e will reverse when the district court's <u>Daubert</u> ruling . . . amount[s] to an abuse of discretion that affected the outcome of the trial." <u>United States v. Brown</u>, 415 F.3d 1257, 1266 (11th Cir. 2005) (internal quotation marks and citations omitted). "An abuse of discretion can occur where the district court applies the wrong law, follows the wrong procedure, bases its decision on clearly erroneous facts, or commits a clear error in judgment." <u>Id.</u> And "a district court abuses its discretion where it fails to act as a gatekeeper by essentially abdicating its gatekeeping role." <u>Id.</u> By failing to perform any analysis under Rule 702, the district court abdicated its gatekeeping function when it admitted Papanicolaou's testimony.

Rule 702 governs the admissibility of expert testimony regardless of whether the case is tried to a jury or a judge. Several of our sister circuits have ruled that

"Daubert's requirements of reliability and relevancy continue to apply in a bench trial." Metavante Corp. v. Emigrant Sav. Bank, 619 F.3d 748, 760 (7th Cir. 2010); see also Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d 769, 779 (10th Cir. 2009); Seaboard Lumber Co. v. United States, 308 F.3d 1283, 1302 (Fed. Cir. 2002). Although "the usual concerns of [Rule 702]─keeping unreliable expert testimony from the jury─are not present in [a bench trial], and our review must take this factor into consideration," Metavante Corp., 619 F.3d at 760; see also Brown, 415 F.3d at 1268─69, the district court must nevertheless "provide more than just conclusory statements of admissibility or inadmissibility to show that it adequately performed its gatekeeping function," Metavante Corp., 619 F.3d at 760 (internal quotation marks omitted). The district court abused its discretion when it failed to make any determination whether Papanicolaou's testimony about history was reliable.

Despite the "reluctance" of the majority "to conclude . . . that the head of an organization is incompetent to testify about the history of the organization," Opinion at 30, we cannot disregard the Federal Rules of Evidence. The majority cites no authority for its "head of an organization" or "institutional knowledge" exception to the requirement of Rule 602 that an ordinary witness must have personal knowledge of the subject of his testimony, and the exception makes no

47

sense. A judicially-crafted rule of evidence allowing the head of an organization, without personal knowledge or qualification as an expert, "to testify about the history of the organization" would, for example, permit the governor of a state to testify in a voting rights case that there was no "history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process," Thornburg v. Gingles, 478 U.S. 30, 36–37, 106 S. Ct. 2752, 2759 (1986) (citation omitted), even though the governor did not have personal knowledge of events that occurred in the state long before he was born. The rule would also allow the chief of an Indian tribe in modern-day America to testify, in an action to establish aboriginal title to land, that "the lands in question were . . . the ancestral home of" his tribe, United States v. Santa Fe Pac. R. Co., 314 U.S. 339, 345, 62 S. Ct. 248, 251 (1941), and the tribe "had inhabited [those lands] from time immemorial," Mashpee Tribe v. Sec'y of Interior, 820 F.2d 480, 482 (1st Cir. 1987). And, in the light of the broad language the majority employs, the rule might also permit the chief executive officer of Delta Airlines to testify, based on the institutional knowledge of the business, that a plane crash did not result from pilot error even though he holds a law degree instead of a degree in physics or aeronautical engineering.

Whether the district court abused its discretion when it admitted and relied upon Papanicolaou's testimony about history is no small matter. The competent evidence in the record establishes that the Sovereign Military Order is an ancient Christian organization that operates charitable hospitals and performs good works around the globe. In the absence of Papanicolaou's inadmissible testimony that the Florida Priory and the Sovereign Military Order share a history, the record makes plain that the Florida Priory has played no part in those good works.

The majority opinion constructs a straw man when it suggests that "a serious scholar would probably be reluctant to cite to a district court's findings of fact as a definitive statement of history." Majority Opinion at 32. The real issue is whether the district court based its findings about history on the testimony of a serious scholar. The district court cannot rely on the testimony of a lay witness about ancient history. The district court must instead rely on the testimony of an expert to make findings about history, which is the province of serious scholars. Instead of relaxing the rules concerning the admission of expert testimony when the subject matter of the testimony is history, we should ensure that those rules have been applied. The district court failed to do so, and we should reverse its ruling that the Sovereign Military Order failed to prove that the Florida Priory engaged in false advertising under the Lanham Act.

49